RUPPENTHAL v. CITY OF ST. LOUIS, Appellant.

Division One, July 1, 1905.

1. **SIDEWALK: Pedestrian: Liability of City.** The street was formerly a public road, fifty feet in the center being macadamized, the fifteen feet on each side remaining in a state of nature. After the city acquired jurisdiction, it kept up the macadamized part, but never at any time graded the other portions or threw them open to travel or invited the public to use them. But there had been on one side for eight years a six-foot granitoid sidewalk 160 feet long, by whom constructed is not shown, but not by the city. At the end of this sidewalk was a prolongation of a dirt sidewalk or footpath three feet wide, and through or under it at the end of the granitoid was a drain pipe, at one end of which was a hole twelve inches square and ten inches deep. Who put the drain pipe there is not shown; it was not done by the city. Plaintiff walking at the edge of the granitoid at ten o'clock at night, having lived in the neighborhood for seven years, but not knowing of the hole, stepped off of the granitoid into the hole and was injured. Opposite a part of the granitoid and the hole the lots were used for agricultural purposes, and for a distance of 1200 feet there were only four houses, the lots being used for truck gardens, etc. The footpath was full of holes, was very much lower than the macadam, and between it and the macadam were tall weeds. There was an electric arc light within 160 feet of the place of the accident. *Held,* that the city was not liable for plaintiff's injuries. *Held,* also, that, even if the sidewalk had by the city been opened for public use, plaintiff by the use of ordinary care could have seen the hole and avoided the accident.

2. ————: ————: ————: **Public Use.** Mere use by the public of a portion of a street that has never been prepared for public use by the city and which the travelling public have not thereby impliedly been invited to use, can not cast upon the city the duty of keeping such portion of the street in repair.

3. ——: ——: **Governmental Discretion.** Whether the whole or only a portion of a street shall be prepared and thrown open to public use, is a governmental question. After the street has been thrown open to public use, the duty devolves on the city to keep it in repair and safe for persons to travel over while exercising ordinary care, but mere use by the public, as for a footpath, of a part of the street that has not been thrown open to public use, can not cast such a duty upon the city.

Appeal from St. Louis County Circuit Court.—*Hon. Jno. W. McElhinney*, Judge.

REVERSED.

*Chas. W. Bates, Wm. F. Woerner* and *Benj. H. Charles* for appellant.

(1) The uncontradicted testimony shows that the so-called "Sidewalk," which plaintiff alleges was out of repair at the point where he was injured, is no city sidewalk at all, but a mere foot-worn dirt pathway running along the uneven surface of the soil; it was never undertaken to be graded, altered or improved by the city, but left in its original state of nature. For such as chose to use the path it served as a continuation of the graded and improved granitoid to the east of it, but such use was not invited or sanctioned by the city, and the wayfarer passed over it at his own risk. Ely v. St. Louis, 181 Mo. 724; Heckler v. St. Louis, 13 Mo. App. 277; Hunter v. Weston, 111 Mo. 184; Moore v. Cape Girardeau, 103 Mo. 476. (2) The court erred in giving instruction I for plaintiff because there was no evidence whatever justifying for submission to the jury the hypotheses (a) that west of the granitoid there "was a sidewalk unpaved," for the evidence showed there was no city sidewalk at all; (b) that "in said sidewalk there existed a hole or depression," because the evidence showed the depression was not in it, but to one side; (c) that plaintiff, "whilst passing along said sidewalk stepped into said hole," because the evidence

shows he was not passing along the path when injured. An instruction which submits to the jury hypotheses of fact concerning which there is no legal evidence is erroneous. Instructions must be framed with reference .to the hypotheses of facts which have been developed in the evidence. Smith v. Sedalia, 152 Mo. 302; Fisher v. Central Lead Co., 156 Mo. 495.

*A. R. Taylor* for respondent.

The startling proposition is asserted that a municipality, when it assumes charge of a street and sidewalk, may stop such sidewalk upon the border of an abyss, and then without notice of the death-trap invite the public to use the portion so open, and thus lead them into the trap. For, in this case, it being dark at night, the · plaintiff walking along this sidewalk, unconscious of danger, reaches the end of the granitoid and without any warning of danger steps into the pitfall smack up against the granitoid portion of the sidewalk and sustains his injuries. As well contend that the city may, after taking charge of a sidewalk, build it in spots. Here a safe piece next a pitfall, then granitoid and then a quagmire. The Ely case, 181 Mo. 724, was a case where the city had only assumed the care of a part of the street, to-wit, about thirty feet in width, and had done nothing towards assuming control over the sidewalk where the plaintiff in that case was injured. Here the city had admittedly assumed the control of this sidewalk.

MARSHALL, J.—This is an action for $5,000 damages for personal injuries, alleged to have been received by the plaintiff on the 29th of July, 1900, on the south side of Arsenal street, about 160 feet west of Portis avenue, caused by the plaintiff stepping into an alleged hole or trench running across the sidewalk, which hole is alleged to be eighteen inches deep,

eighteen inches wide, and three feet long, in consequence of which the plaintiff's left foot and ankle were injured and sprained.

The answer is a general denial, coupled with a plea of contributory negligence. There was a verdict for the plaintiff for $2,500 and the defendant appealed.

. The case made is this:

Arsenal street runs east and west, is eighty feet in width, and is immediately south of Tower Grove Park. It was a macadamized country road at the time of the separation of the city and county of St. Louis. The macadamized portion aforesaid occupies fifty feet of the eighty feet width of the street. Outside of the macadamized portion, the street has never been graded, the city has never exercised jurisdiction over it or invited travel thereon. Weeds to the height of two or three feet grow between the macadamized portion and the outside limits of the street. The macadamized roadway is much higher than the unimproved portion of the street. Along the sides of the street that have not been improved there is a natural water drain. Beginning at Portis avenue and extending 160 feet westwardly, there is a granitoid sidewalk six feet wide, which was built, supposedly, by the abutting property-owners. The city did not construct it or order it constructed, and there is no evidence in the record that it was constructed by the authority or permission of the city. On the corner of Portis avenue and Arsenal street there is a vacant lot one hundred and nine feet seven and three-fourths inches. Immediately west thereof there is a two-story brick house, located on a twenty-five foot lot. West of said house there is a twenty-five foot lot, which is used for truck gardening. Between that point and Kings Highway, a distance of 1,200 feet, there are four houses at considerable intervals. All the remaining portions of the land abutting Arsenal street on the south, is used for agricultural purposes. Between the end of the granitoid

sidewalk and Kings Highway, the southern portion of Arsenal street is in a state of nature, and has never been graded or improved in any manner. The evidence shows that pedestrians have used it for a passway, and by such use there has been created a worn pathway about one foot wide, which is described as not being in as good condition as the ordinary country road. On the north side of Arsenal street, opposite the terminus of Portis avenue, there is an electric arc light. There is also another electric light at the first or second house beyond the western end of the granite sidewalk. About one foot or one foot and a half west of the western terminus of the granitoid sidewalk, someone quite a while before the date of the accident put a pipe extending northwardly and southwardly from the natural drain aforesaid, towards the south, so as to drain the lot lying to the south of the street. There is absolutely no evidence as to who put the pipe in said place, nor is there any evidence connecting the city therewith. The pipe is not as long as the width of the granitoid sidewalk. The pipe is covered over with earth, but the width of the dirt sidewalk, commencing at the western end of the granitoid sidewalk, is only three feet, whereas, the granitoid sidewalk is six feet, thus leaving on each side of the dirt pathway, at the end of the granitoid sidewalk, a space of eighteen inches where there is no sidewalk or pathway. The water had washed holes at each end of the pipe in the said eighteen inches of space, aforesaid. The survey of the place showed the hole on the north side to be ten inches deep and twelve inches in width and in length.

The plaintiff lived on Magnolia avenue, west of Tower Grove Park—Magnolia avenue being the north boundary of Tower Grove Park—and had lived there seven or eight years. His daughter lived at 4146 Wyoming street, which was south and east of the place of the accident. The plaintiff had been in the habit of visiting her about once a week, and in doing so he said

he usually went through the park, and had never used this portion of the street before, and did not know of the hole at the end of the granitoid sidewalk.

On the 29th of July, 1900, the plaintiff and his wife had visited their daughter and started home about ten o'clock p. m. They traveled north on Portis avenue to Arsenal street, and then turned west on the south side of Arsenal street, walking along the granitoid sidewalk. When they reached the end of the granitoid walk, the plaintiff stepped off of the end thereof into the hole, aforesaid, at the northern end of the drain across the dirt walk above described, and was injured.

The plaintiff's evidence tends to show that he suffered a fracture of the fibula, with a rupture of the tendons of the ankle; that he was not able to go out of the house for two months, and that he used crutches for about nine months; that he was totally disabled from work for about three months; that he was a whisky broker, a manufacturer of extracts and flavors for liquors and also of Tamaric Medicinal Bitters, and that his earnings amounted to $1,500 to $2,000 a year.

The defendant's evidence tends to prove that in August, 1900,—the exact date is not stated, but it was within thirty days after the date of the accident—the plaintiff was seen walking around; that, at times, he would have his crutches, and then he would forget them; that sometimes he would have one crutch, under his right arm, and at other times the crutch would be under the left arm, again he would not have any; that he was seen walking on the Morgan-Ford road, about a mile from his home, within a month after the date of the accident. The plaintiff, himself, said, that about three weeks after the accident he went to the place of the accident, using his crutches in doing so, and measured the width of the sidewalk, and the depth of the hole.

The defendant's testimony showed that the city

kept up the macadamized portion of the street, occupy-
ing fifty feet in the center thereof, but had never grad-
ed or undertaken to improve in any way the remain-
ing portion of the street; that on the north side of the
street there were no houses, and on the south side of
the street there were only four houses, in the distance
of 1,200 feet; that there were ten or fifteen acres of the
abutting property, which was used for agricultural and
truck gardening purposes; that the city officers suppos-
ed the property-owners had put in the granitoid side-
walk; that there was no hole or ditch or depression in
the dirt pathway west of the granitoid sidewalk; that
someone had put in the drain pipe aforesaid, and had
not made it as wide as the granitoid sidewalk, thus leav-
ing the dirt pathway eighteen inches narrower on each
side thereof than the granitoid sidewalk, and that the
water had washed out a hole at each end of the pipe or
drain; that the dirt pathway was rough, had hollows in
it, and whilst pedestrians used it, people generally used
the macadamized portion of the street.

At the request of the plaintiff the court instructed
the jury, *inter alia,* as follows:

"1.   If the jury find from the evidence in this case
that Arsenal street, at the places mentioned in the evi-
dence, was an open, public, traveled street within the
city of St. Louis; and if the jury find from the evidence
that there was, at said times, a sidewalk on the south
side of Arsenal street, graded and paved west from
Portis avenue, with granitoid, about 160 feet, and that
thence west to Kings Highway, there was a sidewalk
unpaved; and if the jury find from the evidence that
said sidewalk was used by the traveling public on foot,
and if the jury find from the evidence that at the west
end of the said granitoid in said sidewalk, there exist-
ed a hole or depression; and if the jury find from the
evidence that said hole or depression rendered the use
of the said sidewalk dangerous, and was an obstruction
to travel thereon by the traveling public; and if the

jury find from the evidence that on the 29th day of July, 1900, the plaintiff was passing along said sidewalk and that whilst so doing he stepped into said hole and fell and sustained injuries to his person thereby; and if the jury find from the evidence that the city of St. Louis, by its officers or agents having charge of keeping said street and sidewalk in repair, knew, or by the exercise of ordinary care, could have known of said condition of said street in time to repair the same by the exercise of ordinary care, before the plaintiff's injury, and neglected to do so; and if the jury further find from the evidence that plaintiff, at the time of his injury, was exercising ordinary care, then he is entitled to recover.''

The defendant excepted to the giving of said instruction, and now assigns the same as error. At the close of the plaintiff's case, and again at the close of the whole case, the defendant demurred to the evidence. The court overruled the demurrers and the defendant excepted and now assigns said ruling as error.

I.

The decisive question in this case is, whether the city is liable for the accident to the plaintiff, which occurred within the limits of Arsenal street, but on the portion thereof which the city had never undertaken to improve or to invite the public to use.

Arsenal street, prior to the separation of the city and county of St. Louis, was a county road eighty feet wide. The fifty feet, occupying the central part thereof, was macadamized. The fifteen feet on each side of the macadamized portion, remained in a state of nature. After the city had acquired jurisdiction of the street it continued to keep up the improved portion thereof, but never, at any time, graded the other portions of the street, or threw the same open to public travel or invited the public to use the street. Such unimproved portions were rough, full of holes, grown up

with weeds, and in no sense an improved street or side-walk. Beginning at Portis avenue and running west-wardly for a distance of one hundred and sixty feet, there had been a six-foot granitoid sidewalk for about eight years before the accident. There is no evidence in the record showing who constructed the same. The city's engineer said he supposed the property-owners had done so. At any rate there is no evidence showing that the city had either done it or had given its permission for it to be done. The granitoid sidewalk from Portis avenue, for a distance of one hundred nine feet, extends along an unimproved vacant lot. For twenty-five feet it is in front of an improved lot, and then for twenty-five feet westwardly it is in front of a lot that is used solely for agricultural purposes. Between Portis avenue and Kings Highway, a distance of twelve hundred feet, there are only four houses. The balance of the abutting property, amounting to ten or fifteen acres, is used solely for agricultural and truck garden-ing purposes. Westwardly from the west end of the granitoid sidewalk there is a worn pathway, made by persons walking over the same. Such pathway is three feet wide at the west end of the granitoid side-walk, and at other portions is only a foot wide, and con-cededly is a rough place, with holes and depressions in the same, and lies much lower than the macadamized portions of the street, in fact so much lower that the testimony shows that it would take several thousand yards of filling to raise that portion of the street up to a level with the macadamized portion.

The plaintiff had lived in that neighborhood seven or eight years before the accident and had been in the habit of visiting his daughter, who lived south and east of the place of the accident, at least once a week, and he says he never used Arsenal Street at this point be-fore, and did not know of its condition.

The case made, therefore, is, that the street is eighty feet wide; that the city has improved and thrown

open to public use the central fifty feet thereof, but has never improved or invited the use by the public of the fifteen feet on each side of the improved street, but that the same has been allowed to remain in a state of nature; that some one constructed the granitoid sidewalk, and that some one put in the drain; that there is a dangerous place where the granitoid ceases and the drain was put in, by reason of the drain and cover thereof not being as wide as the granitoid walk. The evidence, however, clearly shows that on the north side of Arsenal street, opposite Portis avenue, and within one hundred and sixty feet of the place of the accident, there is an electric arc light, which was burning at the time of the accident, and likewise another arc light at the first or second house west of the place of the accident.

The liability of a city under such circumstances has been frequently discussed by this court, but the latest and clearest exposition of the law applicable to such case is the opinion of VALLIANT, J., in Ely v. St. Louis, 181 Mo. 723. In that case, as in this, the street was eighty feet wide; the central portion had been graded; the outside portions of the street were in a state of nature; the abutting land was used chiefly for agricultural purposes, and there were weeds growing in the portion of the street that had not been graded. There was, also, a worn pathway along such ungraded portion of the street, which had been caused by pedestrians walking along the same. There was a gully washed across the pathway. The plaintiff was injured by falling into the gully. The trial court nonsuited the plaintiff and the plaintiff appealed. This court disposed of the case in the following clear and exhaustive manner:

"The evidence showed that whilst the city by ordinance established this as a public street, yet it prepared for public use only a wagon road through a part of it, leaving the space that would naturally be the lo-

cation of sidewalks, if sidewalks were made, in a state of nature. The first question that arises is, was the city in duty bound to make a sidewalk, or, failing to do so, was it responsible for the condition of the path; after that comes the question, was the plaintiff using reasonable care in attempting to travel that path on a dark night?

"A municipal corporation on which is conferred the power to establish public streets and, when established, to construct them for public use, in the exercise of that power acts in two capacities, first, governmental, second, ministerial. When the municipality by ordinance declares that land embraced within certain lines is a public street, then, when the city obtains the title to or easement in that land for that purpose, either by gift or condemnation, it becomes a public street, but it is not necessarily then opened to the public for use. And if after that the city passes an ordinance providing for the improvement of the street so as to render it fit for use, even then it is not, by the mere passing of the ordinance, opened for use. In passing those ordinancs the city acts in its governmental, legislative capacity, and in doing so it exercises its discretion in defining the lines and the extent of the street and in declaring in what manner and to what extent it shall be improved and given to the public for use. If in passing an ordinance to establish a street, for example, near the suburbs where the population is sparse, the municipal assembly should be of the opinion that a road thirty feet wide would be sufficient for the then needs of the public, but in anticipation that in the future the population would become more dense and a street 80 feet wide would become necessary, and should provide in the ordinance for the establishment of a street of that width, no one could say that it was an abuse of its power or an unwarranted exercise of its legislative discretion. And if, after so establishing the street, the city should in the exercise of its legislative discretion, be

of the opinion that for the time being a roadway thirty feet wide in the eighty-foot street was all that the public good required and should pass an ordinance providing for the improvement to that extent and no more, no one would have the right to say that the ordinance was unlawful—no one would have a right to insist that the city grade and improve more of the street than in the exercise of its legislative capacity it sees fit to do. In those matters the city acts in its delegated governmental capacity and is not answerable to an individual as for neglect of duty. [Bassett v. St. Joseph, 53 Mo. 290; Keating v. Kansas City, 84 Mo. 415; Kossman v. St. Louis, 153 Mo. 293; Smith on Mun. Corp., sec. 780.]

"But after the ordinance for the improvement of the street has been passed and the city undertakes the work of constructing or reconstructing the street as in the ordinance is required, then the city acts in its ministerial capacity, and if in that capacity it is guilty of negligence to the injury of an individual it is liable. And so after the city has constructed the street or the sidewalk and has thereby invited the public to use it, the city is bound to keep it in condition to be reasonably safe for use and is liable as for negligence if it fails to do so. [Moore v. Cape Girardeau, 103 Mo. 470; Hunter v. Weston, 111 Mo. 176.]

"In the case at bar the city lawfully exercised its governmental discretion to grade and prepare for use only the wagon road in part of the street; it was not required to grade and improve the whole eighty-foot space and build sidewalks on it, and, therefore, is not liable for not having done so. The path through the weeds and over the uneven surface spoke for itself and told every one that there was no sidewalk there, and it invited no one to use it at the city's expense. The city was not responsible for the condition of that path and therefore it will not be necessary to decide wheth-

er by the plaintiff's own evidence he was negligent in traveling the path under the circumstances.

"The circuit court took the correct view in the case."

Speaking to the question here involved this court, in Hunter v. Weston, 111 Mo. l. c. 184, said: " 'A city is not necessarily required to open or put all its streets in a condition for public travel.' [Walker v. Kansas City, 99 Mo. 647.] Nor is it liable for the condition of a street which exists merely on paper. [Moore v. Cape Girardeau, 103 Mo. 470.] 'The responsibility of the authorities for the condition of a highway begins when they have actually opened it for public travel.' [Elliott on Roads and Streets, 456.] 'But the mere fact of establishing a highway by judicial action does not of itself so open it to the public as to render towns liable for accidents that may occur to travelers thereon. After it is thus legally established, it is to be prepared for public use. Labor is to be performed upon it. Bridges are to be built, hills cut down and valleys filled up; obstructions are to be removed and rough places are to be made smooth.' [Blaisdell v. Portland, 39 Me. 113.] 'It may be and doubtless is the case that there are streets and parts of streets in many cities, which are not at present necessary for the convenience of the public, and that will be brought into use by the growth of the city, . . and that all that is required in such cases is that the city shall see that, as the streets are required for use, they shall be placed in a reasonably safe condition for the convenience of travel.' [Bassett v. St. Joseph, 53 Mo. 290; Craig v. Sedalia, 63 Mo. 417.] This alley, which was merely designated on paper, having no existence *de facto,* and never having been opened for public use, defendants owed plaintiff no duty in respect to it as an alley under the said ordinances, and they are not liable in this case.''

The rules thus laid down in the cases cited in no manner conflict with the principles announced by this

court in Brennan v. St. Louis, 92 Mo. 482, and in Walker v. Kansas City, 99 Mo. 647. In the Brennan case the city had graded the whole street, including the sidewalk, thus throwing the whole street open to public use and travel and inviting the public to use the same, and the accident was caused by the city failing to keep the sidewalk in repair after it had once assumed jurisdiction thereof and thrown it open to public use.

In Walker v. Kansas City, the city had constructed a bridge and had originally had a railing on both sides of the bridge, but several months before the accident, the railing on the west side was taken away. The planks on that side were uneven, some projecting from one to two feet further out than others. Whilst in that condition the plaintiff, while walking along the west, unprotected, side thereof, fell off of the bridge and was injured. That, therefore, was a case where the city had assumed jurisdiction over the whole street, throwing it open to public use, and failed to keep it in a safe condition.

In the case at bar the city fell heir to the eighty foot street, but it had never thrown open for public use any part thereof except the fifty feet in the center, and there is no question that such portion was in good condition at the time of the accident. The city had never constructed sidewalks, or thrown open to public use the portion of the street where this accident occurred. Some one had constructed a granitoid sidewalk for one hundred and sixty feet; some one had put in a drain under the dirt pathway at the west end of the granitoid sidewalk and had left a space of eighteen inches at each end of the drain narrower than the granitoid sidewalk, and thereby created a pit-fall or dangerous place. But there is nothing in this record that in any manner connects the city with the construction of the granitoid sidewalk, the drain or the dirt pathway, and therefore the city cannot be held liable for any defects therein.

The instruction given for the plaintiff, hereinbefore quoted, is radically defective and fatal to the plaintiff's case, because it assumes that the city had opened the whole street to the public use and travel thereon, and because it assumes that because the public had used said portion of the street as a footpath, the city was liable for defects therein. The very question in this case was, whether the city had thrown that portion of the street open to public use. Mere use by the public of a portion of a street that has never been prepared for use by the public authorities, and which the traveling public have never been thereby impliedly invited to use, cannot cast upon the public the duty of keeping such portion of the street in repair.

It is always a governmental question whether the whole or only a portion of a street shall be prepared and thrown open to public use. After a street has been thrown open to public use, the duty devolves upon the public authorities to keep it in repair and safe for persons to travel over the same while exercising ordinary care, but mere use by the public, as for a footpath, of a portion of a street that has never been thrown open to public use, cannot cast such a duty on the city. The conditions and surroundings on the south side of Arsenal street from Portis avenue westwardly to Kings Highway were such that the city authorities in their governmental capacity had not considered that the public necessities required the construction of a sidewalk at that point. To construct the same would have necessitated the filling of that portion of the street so as to raise it to the level of the macadamized part, and as the cost of constructing sidewalks, under the charter of St. Louis, must be paid for by the abutting property-owners, the municipal authorities did not deem it necessary or reasonable to require sidewalks to be constructed at that point where the great bulk of the abutting property was solely used for agricultural purposes. The presence of tall weeds, growing on that portion of the

street, gave notice to persons passing along there that such portions of the street had not been thrown open to public travel. The electric arc light, within one hundred and sixty feet of the place of the accident, clearly enabled the plaintiff to see where the granitoid sidewalk ended, and by the exercise of ordinary care he could have seen the drain, the hole or depression at the end thereof, the narrower space covered by the dirt pathway, and he could thereby easily have avoided the accident. The trial court, therefore, erred in giving the plaintiff's first instruction above set out, and, under the evidence adduced in this case, it likewise clearly erred in overruling the demurrer to the evidence.

This case is wholly unlike the case of Wiggin v. St. Louis, 135 Mo. 558, and cases of like character, where the full width of the street had been thrown open to public use, but there was a dangerous excavation outside the limits of the street but so near thereto as to make it dangerous for persons traveling along the street.

For the foregoing reasons the judgment of the circuit court is reversed

All concur.